BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE PROCTER & GAMBLE AEROSOL PRODUCTS MARKETING AND SALES PRACTICES LITIGATION | MDL No. _____ |

BRIEF IN SUPPORT OF DEFENDANT THE PROCTER & GAMBLE COMPANY'S
MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................. 1

BACKGROUND ............................................................................................................................... 2

    A.    Factual Background ............................................................................................... 2

    B.    Pending Actions. .................................................................................................... 4

PROCEDURAL STANDARD ......................................................................................................... 5

ARGUMENT .................................................................................................................................... 6

I.    THE PANEL SHOULD CENTRALIZE ALL CONSUMER CLASS ACTIONS CHALLENGING P&G'S AEROSOL PRODUCTS. ........................................................... 6

    A.    The Actions Involve Common Factual Questions. ............................................... 6

    B.    Centralization Would Serve the Convenience of the Parties and Witnesses by Reducing Duplicative Discovery. ..................................................................... 8

    C.    Centralization Would Promote Just and Efficient Conduct and Eliminate the Risk of Inconsistent Rulings. ............................................................................ 8

II.    THE ACTIONS SHOULD BE CENTRALIZED IN THE SOUTHERN DISTRICT OF FLORIDA, WHERE THE FIRST CASE WAS FILED. ........................... 10

CONCLUSION .............................................................................................................................. 13

## TABLE OF AUTHORITIES

**Cases**

*In re Broiler Chicken Grower Antitrust Litig.*,
   509 F. Supp. 3d 1359 (J.P.M.L. 2020)..................................................................................10

*Bryski v. The Procter & Gamble Co.*,
   No. 0:21-cv-62285-DPG (S.D. Fla. Nov. 4, 2021) .............................................................4, 10

*In re Cable Tie Patent Litig.*,
   487 F. Supp. 1351 (J.P.M.L. 1980)..........................................................................................5

*In re Fairlife Milk Prods. Mktg. & Sales Pracs. Litig.*,
   396 F. Supp. 3d 1370 (J.P.M.L. 2019)............................................................................6, 7, 8

*In re Folgers Coffee Mktg. & Sales Pracs. Litig.*,
   532 F. Supp. 3d 1416 (J.P.M.L. 2021)....................................................................................8

*In re Jan. 2021 Short Squeeze Trading Litig.*,
   MDL No. 2989, 2021 WL 1258399 (J.P.M.L. Apr. 2, 2021)................................................10

*In re Juul Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*,
   396 F. Supp. 3d 1366 (J.P.M.L. 2019) ...............................................................................7, 10

*In re Johnson & Johnson Aerosol Sunscreen Mktg., Sales Pracs., and Prods.
Liability Litig.*,
   MDL No. 3015, 2021 WL 4704800 (J.P.M.L Oct. 8, 2021) .......................................... *passim*

*In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Pracs. Litig.*,
   148 F. Supp. 3d 1364 (J.P.M.L. 2015)....................................................................................9

*In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*,
   MDL No. 2994, 2021 WL 2371289 (J.P.M.L. June 4, 2021)................................................10

*In re Monat Hair Care Products Mktg., Sales Pracs., and Prods. Liab. Litig.*,
   MDL No. 2841, Master Docket No.1:18-md-2841 (S.D. Fla. Mar. 21, 2018)..................11, 12

*In re Saturn L-Series Timing Chain Prod. Liab. Litig.*,
   MDL No. 1920, 2008 WL 4866604 (D. Neb. Nov. 7, 2008) ..................................................6

*In re Zantac (Ranitidine) Prod. Liab. Litig.*,
   437 F. Supp. 3d 1368 (J.P.M.L. 2020).................................................................................6, 7

**Statutes**

28 U.S.C. § 1407...............................................................................................................1, 5, 6, 7, 8

**Other Authorities**

Citizen Petition from Valisure, LLC to the United States Food and Drug
    Administration (Nov. 4, 2021), *available at*
    https://www.regulations.gov/document/FDA-2021-P-1193-0001 (last visited
    Dec. 10, 2021)...................................................................................................................3

Judicial Emergencies (last updated Dec. 12, 2021), *available at*
    https://www.uscourts.gov/judges-judgeships/judicial-vacancies/judicial-
    emergencies (last visited Dec. 12, 2021) ..........................................................................9

MDL Statistics Report - Distribution of Pending MDL Dockets by District (Nov.
    15, 2021), *available at*
    https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_D
    istrict-November-15-2021.pdf (last visited Dec. 10, 2021).....................................................12

U.S. District Courts–Combined Civil and Criminal Federal Court Management
    Statistics (June 30, 2021), *available at*
    https://www.uscourts.gov/statistics/table/na/federal-court-management-
    statistics/2021/06/30-1 (last visited Dec. 10, 2021).............................................................9, 11

U.S. Courts - March 2021 Civil Justice Reform Act, *available at*
    https://www.uscourts.gov/statistics-reports/march-2021-civil-justice-reform-
    act (last visited Dec. 10, 2021) ........................................................................................12

## INTRODUCTION

In early November 2021, an online pharmacy announced that it had detected trace levels of benzene in numerous over-the-counter antiperspirant and deodorant aerosol products, including ones sold by The Procter & Gamble Company ("P&G"). P&G promptly investigated the issue and, even though the trace benzene levels do not pose a health risk, voluntarily recalled the affected aerosol products. P&G also is offering consumers across the country a full reimbursement.

Notwithstanding P&G's swift action, the pharmacy's announcement and P&G's recall triggered a wave of putative consumer class actions. The first of these lawsuits was filed in the Southern District of Florida, and more lawsuits quickly followed. As of the date of this filing, P&G is aware of eleven cases in eight districts brought by nine sets of plaintiffs' counsel, and it expects more lawsuits to be filed. *See* Schedule of Actions, ECF No. 1-2 (collectively, the "Actions"). The cases present overlapping classes and the same overarching theory: that the products plaintiffs purchased allegedly contain unsafe levels of benzene, which plaintiffs contend makes the products worthless and entitles a nationwide class of consumers to full reimbursement. Plaintiffs pursue these claims even though P&G *already* is offering consumers full reimbursement. None of the plaintiffs alleges they suffered any personal injury—nor could they do so given the low levels of benzene detected.

The Panel should centralize the Actions in the Southern District of Florida, where the first lawsuit was filed. These cases readily satisfy the requirements for centralization under 28 U.S.C. § 1407. They involve "common questions of fact": they are based on the same allegations of benzene detected by an online pharmacy in the same products manufactured by P&G, and many later-filed complaints are nearly identical copies of earlier complaints. Centralization will promote "the convenience of parties and witnesses," who will be able to

1

avoid producing documents and appearing for depositions in multiple matters in different jurisdictions across the country. Centralization will also "promote the just and efficient conduct of" the Actions, because it will eliminate the need for multiple and possibly inconsistent rulings. Further, the Southern District of Florida, where two of the Actions are pending (including the first-filed case), is a convenient and accessible district.

This case should follow the same course as *In re Johnson & Johnson Aerosol Sunscreen Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 3015 ("*J&J Aerosol Sunscreen*"). That MDL was triggered by an announcement by the same online pharmacy that it detected trace levels of benzene in Johnson & Johnson's aerosol sunscreen products. Even though the company announced a recall, eight consumer class actions were filed in five districts raising overlapping claims and factual allegations. The Panel centralized these and other tag-along class actions in the Southern District of Florida and assigned the cases to the judge presiding over the first-filed case in that district, Judge Anuraag Singhal. *See J&J Aerosol Sunscreen*, --- F. Supp. 3d ---, MDL No. 3015, 2021 WL 4704800 (J.P.M.L Oct. 8, 2021).

The reasons that made centralization in the Southern District of Florida appropriate in *J&J Aerosol Sunscreen* apply with equal force here. P&G further submits that, for the reasons discussed below, Judge Darrin Gayles, to whom the first-filed Action was assigned, would be an appropriate choice to preside over this centralized proceeding. Alternatively, because the parties in *J&J Aerosol Sunscreen* recently announced they had reached a classwide settlement, Judge Singhal would also be well-positioned to preside over this matter.

## BACKGROUND

A. **Factual Background**

P&G produces and markets various aerosol personal care products, including Old Spice- and Secret-branded deodorant and antiperspirant aerosol sprays. On November 4, 2021, an

online pharmacy known as Valisure LLC ("Valisure") filed a citizen's petition (the "Petition") with the United States Food and Drug Administration ("FDA").[1] The Petition stated that Valisure tested 108 batches of body sprays from 30 brands made by various companies for the presence of benzene. Of these, 59 batches contained detectable levels of benzene, including some batches of P&G's products. Valisure noted that the "variability" of its test results "was high," even within the same batch, with the standard deviation for the tests of some batches as high as 46%. It also observed "significant batch-to-batch variation in benzene content," and acknowledged that several batches of P&G's products did not contain any detectable levels of benzene.

The FDA has not set a limit for benzene concentration in body sprays. The Petition therefore asked FDA to set regulatory limits for benzene concentration levels in body sprays and to set daily exposure limits. The Petition also requested a recall of the 38 batches of products in which it detected benzene at a level greater than 0.10 ppm.

Benzene is not an ingredient in any P&G product. Upon learning of Valisure's findings, P&G immediately launched an investigation. Due to the highly specialized nature of certain aerosol products, the products at issue in these cases are sourced from a contract manufacturer. P&G's investigation revealed that some aerosol products made by that manufacturer contained low levels of benzene due to an issue with its propellant supply. Those products did not exceed any FDA limit on benzene levels because, as previously noted, FDA has not set any limit on acceptable concentrations in this context. And given the trace level of detectable benzene and the nature of these products, the risk of adverse effects from continued use of the products is low.

---

[1] The Petition is available at https://www.regulations.gov/document/FDA-2021-P-1193-0001.

Nevertheless, out of an abundance of caution, on November 23, 2021, P&G initiated a voluntary recall of certain deodorant and antiperspirant sprays produced by this contract manufacturer. In addition to the recall, by completing a simple online form, consumers are able to claim reimbursement of up to $7 per purchased product (i.e., more than the manufacturer's suggested retail price of these products) for up to three product purchases, and they do not need to provide proof of purchase. If a consumer wants to claim reimbursement for four or more product purchases, they can speak by phone with a claim-handler for assistance. To date, approximately 26,600 consumers have made claims for reimbursement.

### B. Pending Actions.

Despite P&G's swift action to investigate, voluntarily recall the products at issue, and offer consumers a full reimbursement, a wave of consumer class actions has been filed against P&G. The first-filed case, *Bryski*, was filed in the Southern District of Florida only hours after the Petition was made public. *See Bryski v. The Procter & Gamble Co.*, No. 0:21-cv-62285-DPG (S.D. Fla. Nov. 4, 2021). Other cases soon followed.

In total, eleven cases have been filed in eight jurisdictions by nine groups of plaintiffs' lawyers. In all, two cases are pending in the Southern District of Florida; three cases are pending in the Southern District of Ohio; and other cases are pending in the Central District of California, Eastern District of California, Southern District of California, Eastern District of New York, Southern District of New York, and District of Oregon. *See* Schedule of Actions, ECF No. 1-2.

The Actions are all based on the allegations in Valisure's Petition, and they assert claims under various states' consumer protection and warranty statutes and related common-law claims. No plaintiff claims he or she suffered bodily harm or personal injury. Instead, plaintiffs primarily seek to recover their alleged economic harm and obtain injunctive relief. They also

seek to represent overlapping nationwide and/or statewide consumer classes. More such cases related to alleged benzene in P&G's aerosol products could well be filed in the future.

The Actions are without merit. Through its voluntary recall and refund program, P&G already offers most of the relief that plaintiffs seek: removal of the affected products and full reimbursement of their purchase price. Indeed, a recall and reimbursement is more than plaintiffs could reasonably expect to recover through litigation, because the products delivered their advertised benefits without any cognizable health risks. Class certification is also inappropriate because (i) P&G's recall program is superior to costly litigation to obtain the same relief, and (ii) determining what products did and did not contain benzene (and in what amounts) cannot be adjudicated on a classwide basis. Furthermore, plaintiffs' claims will fail on the merits because P&G did not misrepresent or conceal any facts from consumers. At bottom, P&G's prompt, thorough, and voluntary action to recall and reimburse products beyond even those referenced in Valisure's Petition shows its commitment to its consumers, and provides them with a more-than-adequate remedy.

## PROCEDURAL STANDARD

This Panel may centralize two or more civil cases for coordinated pretrial proceedings when (i) the cases "involv[e] one or more common questions of fact," (ii) transfer will further "the convenience of parties and witnesses," and (iii) transfer "will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). The party seeking centralization bears the burden of showing Section 1407's requirements have been met. *In re Cable Tie Patent Litig.*, 487 F. Supp. 1351, 1354 (J.P.M.L. 1980).

# ARGUMENT

## I. THE PANEL SHOULD CENTRALIZE ALL CONSUMER CLASS ACTIONS CHALLENGING P&G'S AEROSOL PRODUCTS.

Each of Section 1407's requirements is met here. *First*, the Actions involve common factual questions; they are all based on Valisure's Petition and relate to allegations of trace levels of benzene in aerosol products manufactured by the same P&G contract manufacturer. *Second*, centralization would be more convenient for the parties and witnesses than litigating across at least eight districts from coast to coast. *Third*, centralization would be more efficient for the parties and the judiciary, and it would eliminate the risk of inconsistent rulings by different federal courts around the country.

### A. The Actions Involve Common Factual Questions.

The Actions satisfy Section 1407's first requirement because they feature common questions of fact.[2] All Actions are based on Valisure's Petition and its findings that it detected unsafe levels of benzene in these products. The validity of those findings, including Valisure's suggestion that the levels of benzene it detected are unsafe, present central factual questions. Other central factual questions will also be the same, such as whether P&G misrepresented the ingredients of the products and whether P&G knew that the products contained benzene. This Panel has found shared questions of fact in other consumer cases arising out of Valisure petitions that alleged product contamination, as well as in numerous other class action labeling cases. *See,*

---

[2] By acknowledging that the Actions include "common questions of fact" under 28 U.S.C. § 1407, P&G does not concede that the requirements for class certification under Federal Rule of Civil Procedure 23 are satisfied. These standards are "entirely separate." *See In re Saturn L-Series Timing Chain Prod. Liab. Litig.*, MDL No. 1920, 2008 WL 4866604, at *25 n.21 (D. Neb. Nov. 7, 2008) (noting that "the MDL Panel's determination that [certain] cases meet the 'common questions of fact' standard required by 28 U.S.C. § 1407 is not determinative of whether [those] cases meet the requirement of Fed. R. Civ. Pro. 23 that common issues of fact 'predominate' over individualized issues of fact").

*e.g.*, *J&J Aerosol Sunscreen*, 2021 WL 4704800 (consumer class actions arising out of Valisure petition alleging benzene contamination in other aerosol products); *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 437 F. Supp. 3d 1368 (J.P.M.L. 2020) (consumer class actions ultimately arising out of Valisure petition alleging NDMA contamination); *In re Fairlife Milk Prods. Mktg. & Sales Pracs. Litig.*, 396 F. Supp. 3d 1370 (J.P.M.L. 2019) (consumer class actions involving labeling claims).

In the similar *J&J Aerosol Sunscreen* proceeding, the Panel noted that plaintiffs' claims arose from Valisure's tests and "can be expected to share factual questions arising from allegations that plaintiffs purchased sunscreens manufactured by J&J defendants that contained excessive amounts of benzene." 2021 WL 4704800, at *1. The same reasoning applies here.

Questions about P&G's procurement, manufacturing, labeling, and distribution practices also are common to all Actions. The related question of whether the benzene levels in the affected products pose a safety risk will also be a critical shared question of fact and expert discovery, further underscoring the appropriateness of centralization here. The Panel frequently finds that class action cases should be centralized when they concern common questions of product development, manufacture, labeling, regulation, and safety. *See In re Zantac (Ranitidine) Prod. Liab. Litig.*, 437 F. Supp. 3d at 1369 (finding centralization appropriate in part based on shared fact questions including "the nature and extent of the health risks posed by NDMA and the NDMA levels at issue" and "the impact of any findings made by the U.S. Food and Drug Administration, which is investigating this issue"); *In re Juul Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 396 F. Supp. 3d 1366, 1367 (J.P.M.L. 2019) ("These actions share multiple factual issues concerning the development, manufacture, labeling, and marketing of JUUL products, and the alleged risks posed by use of those products.").

**B. Centralization Would Serve the Convenience of the Parties and Witnesses by Reducing Duplicative Discovery.**

Section 1407's second requirement also is satisfied because centralization would be more convenient for the parties and witnesses than litigating practically identical issues in eleven cases across eight districts from New York to Oregon.

Absent centralization, P&G will be forced to file serial motions to dismiss in different jurisdictions. If the Actions proceed separately and survive motions to dismiss, there will be duplicative discovery and motions practice, given the common fact issues, similar legal theories, and overlapping putative classes among the Actions. For example, because of the overlapping questions related to the presence of benzene in the aerosol products and whether the benzene levels pose any health risks, the document discovery and fact and expert witness testimony sought in each Action is likely to be substantially the same. Separate proceedings would likely subject P&G's fact and expert witnesses to repeated depositions on the same topics and require P&G to negotiate and produce multiple sets of overlapping documents. Centralization thus would thus "offer[] substantial opportunity to . . . reduce duplicative discovery," *J&J Aerosol Sunscreen*, 2021 WL 4704800, at *1, easing the burden on witnesses and parties.

**C. Centralization Would Promote Just and Efficient Conduct and Eliminate the Risk of Inconsistent Rulings.**

Centralization would also promote the just and efficient resolution of the Actions, satisfying Section 1407's third requirement. Indeed, the Panel has centralized putative class actions centered around labeling and marketing when there are fewer such cases pending against a defendant as compared to these cases. *See, e.g.*, *In re Folgers Coffee Mktg. & Sales Pracs. Litig.*, 532 F. Supp. 3d 1416, 1416 (J.P.M.L. 2021) (five cases); *In re All-Clad Metalcrafters, LLC, Cookware Mktg. & Sales Pracs. Litig.*, 532 F. Supp. 3d 1411, 1412 (J.P.M.L. 2021) (four

8

cases); *In re Fairlife Milk Prod. Mktg. & Sales Pracs. Litig.*, 396 F. Supp. 3d at 1370-71 (four cases with four potential tag-alongs).

No litigation has occurred in any of the Actions. The Actions are all at a very early stage, the earliest case having been filed on November 4. No case management conferences have been held, no substantive motions have been filed, and no discovery has occurred. Allowing nine groups of plaintiffs' lawyers to pursue eleven different cases in eight different courts would unnecessarily burden numerous federal courts, some of which carry some of the heaviest caseloads in the country[3] and are located in jurisdictions where judicial emergencies have been declared.[4] "Centralization offers substantial opportunity to streamline pretrial proceedings; reduce duplicative discovery and conflicting pretrial obligations; . . . and conserve the resources of the parties, their counsel and the judiciary." *J&J Aerosol Sunscreen*, 2021 WL 4704800, at *1.

Absent centralization, there would also be a substantial risk of inconsistent rulings affecting the same putative class members at all stages of the litigation, including on motions to dismiss, discovery motions, *Daubert* motions, class certification motions, and summary judgment motions. Inconsistent class certification rulings alone could greatly complicate the litigation, and the Panel routinely cites the need to avoid such inconsistencies in centralizing

---

[3] *See* U.S. District Courts–Combined Civil and Criminal Federal Court Management Statistics (June 30, 2021), *available at* https://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2021/06/30-1 (last visited Dec. 10, 2021) (indicating that for the 12-month period ending June 30, 2021, the Southern District of Ohio had 2,257 pending cases per judgeship; the Eastern District of California had 1,325 pending cases per judgeship; and the Eastern District of New York had 849 pending cases per judgeship).

[4] *See* Judicial Emergencies (last updated Dec. 12, 2021), *available at* https://www.uscourts.gov/judges-judgeships/judicial-vacancies/judicial-emergencies (last visited Dec. 12, 2021) (indicating that judicial emergencies existed in the Eastern and Southern Districts of New York and the Central, Eastern, and Southern Districts of California).

9

proceedings. *See, e.g.*, *J&J Aerosol Sunscreen*, 2021 WL 4704800, at *1 (finding need to prevent inconsistent pretrial rulings, "particularly on such issues as common *Daubert* challenges and class certification motions," warranted centralization); *In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Pracs. Litig.*, 148 F. Supp. 3d 1364, 1366 (J.P.M.L. 2015) (in labeling case, finding centralization appropriate to "avoid inconsistent pretrial rulings, particularly on class certification").

## II. THE ACTIONS SHOULD BE CENTRALIZED IN THE SOUTHERN DISTRICT OF FLORIDA, WHERE THE FIRST CASE WAS FILED.

The Actions should be transferred to the Southern District of Florida, where the first-filed case (*Bryski*) was filed. The Panel often considers the venue of the first-filed action when determining where to centralize related cases. *See In re Broiler Chicken Grower Antitrust Litig.*, 509 F. Supp. 3d 1359, 1362 (J.P.M.L. 2020) (centralizing in Oklahoma because "[t]he Oklahoma action is the first-filed action"); *In re Juul Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 396 F. Supp. 3d at 1368 (noting pendency of first-filed case in district as factor). This is so even where the first-filed action is not the defendant's home district. In the *J&J Aerosol Sunscreen* case, for example, the Panel centralized those cases the Southern District of Florida, where the first case was filed, even though J&J is headquartered in New Jersey and more actions were pending in that district. 2021 WL 4704800, at *2. Moreover, two cases are currently pending in the Southern District of Florida, whereas most other potential transferee districts only have one pending case.[5] *See In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, MDL No. 2994,

---

[5] As of this filing, three cases have been filed in the Southern District of Ohio. But two of those complaints—the *Velasques* and *Esquivel* cases—were filed by the same plaintiffs' lawyers and involve virtually identical allegations and claims.

10

2021 WL 2371289, at *2 (J.P.M.L. June 4, 2021) (transferring cases to Southern District of Florida in part because two of six pending cases were filed there).

The Panel also has repeatedly recognized the benefits of the Southern District of Florida as a transferee forum. It "is a relatively convenient and accessible forum, with the resources and the capacity to efficiently handle what may be a large and complex litigation." *In re Jan. 2021 Short Squeeze Trading Litig.*, MDL No. 2989, 2021 WL 1258399, at *3 (J.P.M.L. Apr. 2, 2021); *see also J&J Aerosol Sunscreen*, 2021 WL 4704800, at *2 (finding "the Southern District of Florida offers a convenient and readily accessible district," even though it was not the jurisdiction where the defendant was headquartered). The Southern District of Florida is convenient for not only the three plaintiffs who have filed suit in that jurisdiction, but also for the Florida resident who is one of the named plaintiffs in the *Velasques* case pending in the Southern District of Ohio. The Southern District of Florida is roughly equidistant for most of the remaining plaintiffs, who reside in California, Oregon, Ohio, Missouri, New York, and Vermont. Moreover, of the nine groups of plaintiffs' lawyers that have filed suit against P&G, three include at least one lawyer that is either located in the Southern District Florida or has entered an appearance in the *J&J Aerosol Sunscreen* MDL in that district, demonstrating the convenience of that forum for plaintiffs' counsel. P&G, its counsel, and its witnesses are likewise willing to travel to the Southern District of Florida.

Furthermore, at 378 pending cases per judgeship, the Southern District of Florida has a significantly lower average caseload than any of the possible alternative fora. The Southern District of Ohio has 2,257; the Eastern District of California has 1,325; the Eastern District of

11

New York has 849; the Southern District of New York has 686; the District of Oregon has 602; the Southern District of California has 529, and the Central District of California has 523.[6]

Within the Southern District of Florida, Judge Gayles is assigned the first-filed case and would be an appropriate choice to oversee this litigation. Judge Gayles has experience managing an MDL of similar size: he is currently presiding over *In re Monat Hair Care Products Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 2841, Master Docket No. 1:18-md-02841-DPG (S.D. Fla. Mar. 21, 2018), which involves 13 cases.[7] The parties recently indicated that those cases were likely to settle, suggesting that Judge Gayles may also have capacity to take on this proceeding. *See id.*, ECF No. 247 (Dec. 1, 2021) (stating that the parties "are participating in ongoing negotiations regarding settlement, and anticipate that this matter is likely to resolve"). Judge Gayles has no cases or motions listed in the Civil Justice Reform Act statistics, demonstrating that he manages his civil docket effectively.[8]

Another sensible choice in the Southern District of Florida would be Judge Anuraag Singhal. The Panel recently assigned Judge Singhal the *J&J Aerosol Sunscreen* MDL, noting that Judge Singhal "has not yet had the opportunity to preside over multidistrict litigation." *J&J Aerosol Sunscreen*, 2021 WL 4704800, at *2. Yet just 21 days after the Panel's transfer order, counsel for plaintiffs in the two first-filed cases and the defendants filed a notice of a classwide

---

[6] U.S. District Courts–Combined Civil and Criminal Federal Court Management Statistics (June 30, 2021), *available at* https://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2021/06/30-1 (last visited Dec. 10, 2021).

[7] MDL Statistics Report - Distribution of Pending MDL Dockets by District (Nov. 15, 2021), *available at* https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-November-15-2021.pdf (last visited Dec. 10, 2021).

[8] U.S. Courts - March 2021 Civil Justice Reform Act, *available at* https://www.uscourts.gov/statistics-reports/march-2021-civil-justice-reform-act (last visited Dec. 10, 2021) (see CJRA Tables 7-11).

settlement, suggesting that the *J&J Aerosol Sunscreen* MDL is not expected to involve significant litigation. *See J&J Aerosol Sunscreen*, MDL No. 3015, Master Docket No. 0:21-md-03015-AHS (S.D. Fla.), ECF No. 1 (Oct. 8, 2021 transfer order); ECF No. 25 (Oct. 29, 2021 notice of settlement). Like Judge Gayles, Judge Singhal has the experience needed to effectively steer this litigation, and his absence from the Civil Justice Reform Act statistical lists indicates that he also manages his docket effectively.

## CONCLUSION

The Actions listed on the Schedule of Actions, and any related tag-along cases, should be centralized for pretrial proceedings in the Southern District of Florida and assigned to either Judge Gayles or, in the alternative, to Judge Singhal.

Dated: December 13, 2021

Respectfully submitted,

*/s/ Andrew Soukup*
Andrew Soukup
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-5066
asoukup@cov.com

*Counsel for Defendant*
*The Procter & Gamble Company*